UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
DAVID BRAY,
      Plaintiff,                                    Docket No.: 18-cv-5205

-against-                                       **SECOND AMENDED**
                                                           **COMPLAINT**
PURPLE EAGLE ENTERTAINMENT, INC., and
RICHARD MGRDECHIAN,
      Defendants.
------------------------------------------------------------------------X

        COMES NOW Plaintiff, DAVID BRAY, by and through counsel, and Complains of the

Defendants, PURPLE EAGLE ENTERTAINMENT, INC. and RICHARD MGRDECHIAN as

follows:

## **<u>INTRODUCTION</u>**

        1.      This is an action against Purple Eagle Entertainment, Inc. ("Purple Eagle"), and

Richard Mgrdechian, the principle of Purple Eagle, over to their unlawful activities related to the

rock music band Madison Rising, for which Plaintiff David Bray was the frontman and lead singer.

        2.      Mr. Mgrdechian originally conceived of creating a political rock band but, lacking

the musical talent, he set out to hire musicians to bring his idea to fruition, under his company,

Purple Eagle.  This eventually led to the creation of the band Madison Rising.  As a Navy veteran,

who had promoted patriotic ideals and military support in his prior musical ventures, it seemed

like the perfect fit for Mr. Bray.

        3.      Despite Mr. Bray's talent and abilities, Mr. Mgrdechian chose to hire him under a

"work for hire" contract to perform materials that were to be written and provided to Mr. Bray by

Mr. Mgrdechian and Purple Eagle.  Mr. Bray was not expected to contribute creatively, but rather

to act solely as a performer under his contract.

4.     Soon thereafter, it became apparent that rather than pursuing critical and commercial success as a patriotic rock band, the creative direction Mr. Mgrdechian was pursuing was causing the band to become a caricature and a punchline. Mr. Bray decided that if the band was to become successful, Mr. Bray would have to exert creative influence.

5.     Recognizing the fantastic opportunity to fill a vacant niche, Mr. Bray began to voluntarily provide songs and materials, which, although not contracted for, Mr. Mgrdechian accepted and approved for the band to perform, without any contractual protections and providing Mr. Bray no consideration in exchange.  This new, quality musical material, created by Bray, is what helped to elevate Madison Rising from a glorified bar band to a legitimate National Touring Act.

6.     Equally important to their development, Mr. Bray carefully steered the band away from Mr. Mgrdechian's message of alt-right divisiveness to a more positive and patriotic message of hope.  The new direction of the band was clear from the writings and performances.  The new message of positivity brought the band more in line with the mainstream and directly resulted in critical success for the band, national recognition, and a significantly expanded following.

7.     The significantly increased value of the Madison Rising brand is a direct result of Mr. Bray's creative direction, which was not part of Mr. Bray's contract, and which Purple Eagle has failed to properly compensate him for.

8.     When Mr. Bray's contract expired on May 31, 2014, Mr. Mgrdechian refused to pay him the required contract extension fee, instead telling Mr. Bray that they were "basically partners" and Mr. Bray continued to perform with the same salary, but without the benefit of a contract and with the understanding that his partnership would result in financial benefits, once the band began turning a profit.

2

9.      Soon, Purple Eagle fell behind in its salary obligations and Mr. Mgrdechian tried to renegotiate the relationship with Mr. Bray.  In a poorly calculated negotiating move, Mr. Mgrdechian fired Mr. Bray, in the hopes that this would cause Mr. Bray to come back to the table with a willingness to accept Mr. Mgrdechian's one-sided terms.  Knowing that Mr. and Mrs. Bray's only source of income for their family was from Purple Eagle, he used their termination to try to coerce them into signing an unfair contract. Mr. Mgrdechian was also 2 months behind on Bray's salary at this time.  Unfortunately for Purple Eagle, this move backfired, as Mr. Bray refused to capitulate and instead went out on his own as a solo act.

10.      Predictably, the termination of Mr. Bray led to a significant loss of business for Madison Rising, as the band's image and identity were so closely linked to Mr. Bray's identity and personality. Defendants hired a new frontman, but this changed the entire persona of the band and angered many fans.

11.      Having failed to coerce Mr. Bray into returning to work for Purple Eagle and clearly losing the public relations war to keep their fans and gigs, Defendants instead chose to damage Mr. Bray's career and reputation through the filing of a frivolous lawsuit in New York State Court (the "related case.").[1]  Defendants used this related case, and the associated litigation privilege, to defame Plaintiffs by publishing false and defamatory statements about them, as well as publishing private information in court papers and then immediately publishing press releases to ensure widest dissemination of these false statements.

---

[1] Although the related case has always had diversity of citizenship, the amount in controversy was well below the $75,000 required for diversity jurisdiction.  However, on March 30, 2018, Purple Eagle filed an amended complaint asserting five different causes of action.  While entirely baseless, each of these causes of action seeks in excess of $1,000,000 damages, thereby creating diversity jurisdiction.  Mr. Bray has therefore filed a notice of removal and asks that these cases be marked related and, potentially, consolidated.

12. Throughout Mr. Bray's relationship with Defendants, he wrote a significant number of musical compositions, which were not requested by Purple Eagle and therefore not subject to the ownership provisions of the contract, when the contract was still in effect. Purple Eagle eagerly used these compositions without compensating Mr. Bray for them and now falsely claims ownership in an effort to prevent Mr. Bray from using his own intellectual property.

13. Moreover, Mr. Bray's significant, uncompensated contributions to the band, with the understanding that he was a partner, should result in the imposition of a constructive trust in Plaintiff's favor.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(1).

15. Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(2) or, alternatively, 28 U.S.C. § 1391(b )(3).

16. This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. §1332. The Defendant is a citizen of a state different than that of the Plaintiff and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Plaintiff also invokes the supplemental jurisdiction of this Court with respect to claims based upon the laws of the State of New York, pursuant to 28 U.S.C. § 1367.

## THE PARTIES

17. Plaintiff David Bray, is a professional musician and U.S. Navy veteran. He resides in York, Pennsylvania.

18. Purple Eagle Entertainment, Inc. is a New York corporation with its principle offices at 641 Lexington Ave, 15th Floor, New York, New York, 10022

19.     Richard Mgrdechian is the founder and CEO of Purple Eagle Entertainment, Inc. He resides in Queens, New York.

## STATEMENT OF FACTS

### Plaintiff's Background

20.     Mr. Bray served in the United States Navy from 1993 to 1997. He was enlisted as a Hospital Corpsman, the military equivalent of a paramedic. He spent the majority of his career, when not in school, assigned to United States Marine Corps ("U.S.M.C.") units as a combat medic, known as a Fleet Marine Forces Corpsman or "Devil Docs."

21.     Mr. Bray attended a number of schools and received specialized training in combat medicine, Urban Sniper School/Reconnaissance and Surveillance School.

22.     Mr. Bray deployed with the 22nd Marine Expeditionary Unit aboard the USS Guam. In 1996, he participated in Operation Assured Response provided force protection and assisted in the evacuation of American citizens from the US Embassy in Monrovia, Liberia, during the escalation of Liberia's civil war.

23.     Mr. Bray was honorably discharged from the United States Navy in 1997.

24.     After serving in the United States Navy, Mr. Bray went into a career in the music and entertainment business and was the lead singer for two professional bands prior to being offered employment by Purple Eagle: "Soveren" and "1echo1"[2]. Soveren and 1echo1 both played music about war, brotherhood, the sacrifices made by Gold Star families, and battling demons though faith.

25.     Mr. Bray was the lead singer for Soveren for approximately seven (7) years, and Mr. Bray was the lead singer of 1echo1 for approximately one (1) year

---

[2] 1echo1 was Mr. Bray's call sign when he served in the United States Navy.

**Band Hiring Contest**

26.    Although Mgrdechian had created a company, which he billed as a record label, he had no musicians to perform his works.  He therefore set out to recruit musicians.  His first acquisition was guitarist and songwriter Chris Schreiner, who he named Chief Musical Officer (CMO).

27.    On January 9, 2011, Purple Eagle posted an advertisement video on various social media sites.  This video was narrated by Chris Schreiner and featured the following pitch:

> Are you a patriot?  Are you a dynamic rock musician and performer?  A great drummer?  Vocalist?  Bassist?  Or guitarist?  If so, we want to hear from you.  My name is Chris Schreiner.  My associates and I are putting together an exciting new project.  We're looking for serious musicians to perform our original compositions throughout the United States at political rallies, festivals and club dates starting in summer, 2011.  If you feel that you are the right person or you think you have a friend who may be interested, please don't hesitate to contact us.

28.    On February 11, 2011, Purple Eagle posted a second advertisement video, this time focused on finding a singer to lead the band.  This video, entitled "NYC Record Label Presents – MALE ROCK SINGER CONTEST ($1000 and other prizes).  In this video, Chris Schreiner states:

> Can you sing?  Would you like $1000 cash and the opportunity to audition in front of record executives in New York City? Then you should enter this online competition.  My name is Chris Schreiner any my associates and I are searching for a dynamic male rock vocalist aged 21 through 35 to front one of our national acts going on tour this summer.  If you think you're up for it, this is how to submit. Download the instrumental tracks right here. You can either compose your own verse and chorus for a track and send that or you can do a cover.  Creed's Freedom Fighter.  It doesn't matter what you do, we just want to see how you sing. Whatever is the best showcase for your voice is what we want to hear.  If you'd rather do an original, then by all means, record an original.  Although we're not looking for songwriters, just singers.  Record yourself singing along with the track, live. Go to purple-eagle.com and upload the track under the contest tab.  The top three finalists will be invited to New York City to audition.  The winner, as I said, will receive $1000 cash and a contract to go on the road with our band.  The deadline to submit is March 4th.  The winners will be announced shortly thereafter.

6

29.    Of course, these advertisements did not disclose that the "record executives" and "associates" was just Mr. Mgrdechian, who had never produced a single record.

30.    Plaintiff was one of the singers who answered this advertisement.  Using the instrumental track provided, Plaintiff added lyrics that he had previously written about what motivates citizens to join the military and recorded the song.  This composition was eventually included on the first album as "Soldiers of America."

<strong>The Parties Enter into a Contract</strong>

31.    On May 31, 2011, Plaintiff signed a "Band Member Agreement"[3] to "become a member of the pro-American, pro-liberty band tentatively named 'Authors of Liberty.'"  This agreement provided that Plaintiff would be employed "as a work-for-hire, except as provided for elsewhere in this Agreement, band member in recording and performing… the music, songs and lyrics… as provided to Musician by the Company."

32.    While the contract primarily anticipated that Plaintiff would be a performance musician, performing material that had been provided to him, the contract also did address the intellectual property rights of any material that Plaintiff may participate in creating.  However, these potential writing contributions were limited in scope, providing that "Musician acknowledges and agrees that Musician shall contribute if and only when request by the Company, and then Musician shall only contribute at his reasonable discretion."

33.    This contract does not govern any musical compositions which Plaintiff authors, independent of a specific request by Defendants.  As Defendants chose to classify Plaintiff as an independent contractor, Plaintiff was legally permitted to write his own musical compositions, which were not subject to this contract.

---

[3] A copy of this agreement is annexed hereto at Exhibit "A."

34.     The contract further provided that "in the event that Musician contributes materially to the authorship of any of the Material [at Plaintiff's request], Musician shall receive writers' credit and royalties in conjunction with all other co-author's of such Material for such Material."

35.     The contract was for a period of three years, which would expire on May 31, 2014. However, the contract did provide that:

> Prior to the expiration of the Employment Period, the Company and Musician shall be permitted to mutually agree, in good faith, to extend the Employment Period for an additional three (3) year period upon payment of a mutually agreed to extension fee to Musician not to exceed $25,000.

**The Beginning of Madison Rising**

36.     After signing the contract, Plaintiff went to work with the band.  While Mr. Mgrdechian had tentatively named the band "Authors of Liberty," the parties set out to find a more commercially attractive name.  Mr. Mgrdechian and the band members sat down to brainstorm ideas and ultimately decided on the name Madison Rising.  This name was a nod to James Madison, the 4th President of the United States, who is often referred to as the "Father of the Constitution" for his role in drafting the Constitution, the Federalist Papers, and the Bill of Rights. The group decided on Madison, in part because their studio was located was Madison Street, Hoboken.

37.     For the next several months, the band worked on producing their debut album, entitled "Madison Rising."  This album would be released on October 17, 2011.

38.     It was during this period that Mr. Bray came to realize that Mr. Mgrdechian's vision was not for a patriotic pro-American rock band, but rather a less commercially desirable product.

39.     To further this goal, the album included songs such as "Rally the Youth," "Where Was the Media Then," "Before the Hyphens Came," and "In the Days That Reagan Ruled."  The

majority of the music was provided to Plaintiff to perform, without asking for any of his creative input, resulting in an album that has been considered by many to be musically unpalatable.

40.     Mr. Bray did provide input into four of the songs, including "Soldiers of America," which he had written as part of his audition tape.  Plaintiff received writers credit through performing rights organization, ASCAP, but was never paid any of the contracted for royalties, (such as mechanical royalties on album sales) as follows:

   a.  Soldiers of America – 25%
   b.  Hallowed Ground – 12.5%
   c.  Before the Hyphens Came – 10%
   d.  Right to Bear – 12.5%

41.     In addition to recording, Mr. Mgrdechian attempted to market the band. Unfortunately, due to the poor quality of the musical compositions, the band failed to garner any genuine attention or recognition.

42.     The only attention the band did receive was the fact that they were touting the "conservative" tagline, a music industry *faux pas*.  The band appeared on Fox News, but was soon banned from the Huckabee show due to drummer Sam Fishman disobeying security by entering an unauthorized area.  Additionally, in a pattern that would be repeated throughout the band's existence, the band members (aside from Mr. Bray) showed up at the Fox News studios reeking of freshly smoked marijuana.

43.     During this time, Plaintiff and other band members were prohibited from answering any questions on interviews that had not been scripted or ghostwritten by Mgrdechian.  When Mr. Bray attempted to push back, Mr. Mgrdechian responded that "there are certain ways to word things that you don't understand and can't comprehend."  It was not until later that Mr. Bray was permitted to speak his point of view, rather than parroting Mr. Mgrdechian's message.

44.    As the band became widely mocked and treated as a punchline, it became clear to Mr. Bray that unless he could shift the direction of the band away from Mr. Mgrdechian's branding, the band was doomed for failure.

**The Star-Spangled Banner and the Rise of Madison Rising**

45.    As a resident of York, Pennsylvania, Mr. Bray commuted weekly to New York on the train.  During these commutes, he could observe an incredible cross section of America.  He saw the Amish farmers and their mule teams tilling the soil, the suburbs of Philadelphia and their spray-painted impoverished neighborhoods, through New Jersey and then finally into New York City.  On the train, he saw it all, the innocent, the hard working, the rich, the poor, the Industry, the big businesses.  He saw a cross-section of America every morning that afforded him a profound appreciation for the state of our Country.  This inspired Mr. Bray to write a song.  A new take on am American classic – the Star-Spangled Banner.

46.    Mr. Bray began writing.  Inspired by the words of Francis Scott Key and the groundbreaking interpretation by Jimi Hendrix, Mr. Bray knew that all the song needed was a great bridge and a new rock composition.  With all of this in mind, he wrote the bridge:

> Because we are the brave-Yes we are the brave-We'll fight tyranny in the name of the free-We are the US of A… For those unaware-That flag is still there-It's our future to save-This land of the brave-The US of A…

47.    At the next rehearsal, which Mr. Mgrdechian did not attend, Mr. Bray shared his composition and arrangement with the other band members.  He showed Steve Padelski the bass intro, which was reminiscent of the "clickety-clack" of the train.  He guided Sam Fishman on the drum dynamics, swells and changes until he had the feel and then they ran the song a few times with Mr. Bray singing until they had a strong grasp on his vision.  Once Alex Bodnar arrived, Mr.

Bray showed him where the Hendrix inspired solo sat in the composition. Once they had gotten it together, the band took a cell phone recording of the song to present to Mr. Mgrdechian.

48.    Mr. Mgrdechian immediately rejected the song, admonishing the band to "quit wasting time in the rehearsal studio" on his dime.  He also said "we don't want to be known as the band that screwed up the Star Spangled Banner" and prohibited the band from performing the song at any live performances.

49.    On March 11, 2012, Mr. Bray decided to defy Mr. Mgrdechian's directive when the band played a show at The Underground in Nashville, Tennessee.  Mr. Bray convinced the other band members to play the Star-Spangled Banner by promising to take full responsibility when Mr. Mgrdechian lost his temper.

50.    As Mr. Mgrdechian watched the performance, Mr. Bray went forward with performing the Star-Spangled Banner.  Mr. Mgrdechian's refrained from launching into an abusive tirade because the crowd clearly loved the performance.  The crowd's wild approval of this song contrasted to their lukewarm reception of the rest of the songs.

51.    With the evidence of public reception in hand, Mr. Bray finally had the leverage he needed to convince Mr. Mgrdechian to let the band record the song and take the band in a new creative direction.  Thus, Madison Rising began to transform from Mr. Mgrdechian's alt-right puppet show into a legitimate and popular band.

52.    With Mr. Mgrdechian's grudging approval, Mr. Bray led the band back into the studio to record the Star-Spangled Banner on April 20, 2012.  This time, unlike recording sessions for the previous album, Mr. Bray asserted himself to produce the recording, overseeing the mixing and mastering process, to ensure that the final recording was perfect.  He had almost achieved the perfection he sought when Mr. Mgrdechian ended the post-production phase prematurely.

53.     At Mr. Bray's request, Mr. Mgrdechian hired a videographer to film the band working in the studio.  Mr. Bray then explained his vision of a music video to Mr. Mgrdechian, combining scenes of the band in the studio, along with classic American scenes and stock celebrity and sports footage.  Although Mr. Mgrdechian took Mr. Bray's ideas, he purposefully excluded Mr. Bray from the process, claiming that Mr. Bray was too picky and took too much time in post-production.  Because Mr. Mgrdechian excluded Mr. Bray and rushed production, the result was not as professional as it could have been, with audio not matching the vocal performance, and other minor imperfections.

54.     The music video was released on YouTube on May 24, 2012.  For the first time, Madison Rising was a viral hit.  As the video became more popular, the band issued a "One Million Star-Spangled Banner Challenge," to try to get over a million views on YouTube before election day, November 6, 2012.  This goal was surpassed five weeks early.  Madison Rising was finally on their way to being successful.

**American Hero**

55.     Having proven to Mr. Mgrdechian that patriotism and good music is more popular and profitable than poorly written, divisive, hate-driven music, Mr. Bray began to write more material.  None of this material was requested by Mgrdechian or Purple Eagle, but Mr. Bray offered that the band could use it, both in live performances, as well as on the next album, with the expectation that he would be paid accordingly.

56.     After the success of the Star-Spangled Banner, Mr. Bray decided to do a rock version of another classic – America the Beautiful.  The remainder of the album was made up of original songs composed by Mr. Bray, released on November 5, 2013.

57.    The album was a clear departure from the band's first album, both in terms of musical style and quality, as well as subject matter, which had shifted in favor of pro-American, patriotic themes.  Songs such as "Open Road," about riding motorcycles through the American countryside, "Lock N' Load" about the Navy SEALs, and "Hero" about the need for political leaders who can unite the people for the common good.

58.    Mr. Bray also wrote a sequel to one of the better songs from the original album, "Hallowed Ground II," about a military officer who sacrifices his life to save his men:

> Another day on the job, a man, his men and their guns.  Holding off the enemy for three hot days in the desert sun.  The decision he made, his men or the grave, was do or die for him that day.  He stepped into the line of fire, and a hero he became. Because on that day, he was a hero, a man of the flag, the likes of which are rarely found.  He gave his life, so remember his story and bury him in hallowed ground.
>
> Another day back home and a woman hears a knock on her front door.  The silhouettes of those unknown soldiers standing tall on her front porch.  She already knows, she'll never again hold the man that she sent off to war. He stepped into the line of fire and they watched her teardrops fall…

59.    As the only United States Veteran associated with the group, it fell to Mr. Bray to ensure that the band's performances were appropriately respectful, while appealing to the veteran community, which was quickly becoming a large demographic of Madison Rising's growing fan base.  Songs like "Hallowed Ground," "Reflection (PTSD)," and "Lock N' Load" were written and performed as only a member of the veteran community could.

60.    Later, the band would release a deluxe remastered edition of American Hero – American Hero (Red).  This album, released on June 15, 2015, had all of the songs from the original American Hero album (except "Come to the Ready," a hold-over from the band's Mgrdechian-inspired divisive days), plus two new original compositions by Mr. Bray, "Amazing

America" and "Soldier's Christmas," plus rock versions of the classics, "The Marine Hymn" and "God Bless America."

61.    Although these two albums, and some associated singles, were successful, Purple Eagle never paid Mr. Bray any royalties, despite the albums having been written almost entirely by Mr. Bray.

62.    In fact, Mr. Mgrdechian refused to pay to record Soldier's Christmas or The Marine's Hymn.  Plaintiff and Sam Fishman paid for these recordings out of their own pockets and were never reimbursed.

63.    In addition to composing the music and lyrics, Mr. Bray was the creator, photographer and designer for the artwork on both the "American Hero" and "American Hero RED" albums.  This was also not requested, contracted for, or compensated.

## Madison Rising on the Road

64.    Riding high on the viral success of their rendition of the Star-Spangled Banner, soon Madison Rising was constantly booked and traveling with shows across the country.

65.    Mr. Mgrdechian also wanted to be on the road with the band, so that he could reap the rewards and accolades of the band's success.  To bolster his image, Mr. Mgrdechian renamed his social media pages to emphasize that he was the "Creator of Madison Rising" despite the fact that the band only became successful when they moved away from Mr. Mgrdechian's creative input.

## Madison Rising's Business Development

66.    As Mr. Mgrdechian's promotional leadership had resulted in little success, and mostly mockery, under the "Conservative Band" moniker, Mr. Bray began to take a more active role in marketing, resulting in the rebranding as "America's Most Patriotic Band."

67.     Through Mr. Bray's efforts, Madison Rising gained significant traction, forging relationships with various nationally recognized organizations.  Invariably, these organizations were both drawn to Mr. Bray, while being repulsed by Mr. Mgrdechian.  Several organizations only agreed to work with Madison Rising if they could deal directly with Mr. Bray and did not have to communicate with Mr. Mgrdechian.  It became clear that while Mr. Bray had successfully changed the personality of Madison Rising, he could not change Mr. Mgrdechian. The director of one of the above-mentioned organizations had expressed his uneasy feeling and distrust in working with Mr. Mgrdechian, but that he trusted Mr. Bray and would sign off on the sponsorship.

### Purple Eagle Chooses not to Renew Mr. Bray's Contract, Instead Making Him a Partner

68.     Mr. Bray's contract was set to expire on May 31, 2014.  While Mr. Bray approached Mr. Mgrdechian about extending the contract for another term, Mr. Mgrdechian refused, as the contract required him to pay Mr. Bray an extension fee.

69.     The written agreement, which is attached to this complaint imposes an express obligation on the parties to "upon payment of a mutually agreed to extension fee" to extend its term.  There was no automatic contract renewal even if the parties mutually and silently continued to operate as if it had.

70.     Defendants have admitted that there was no "payment of an extension fee, even though Mr. Bray sought such fee."

71.     After much haggling, Mr. Mgrdechian told Mr. Bray that they did not need a new or extended contract because, with all of the valuable contributions Mr. Bray had made, they would continue without a contract and were "basically partners."  Mr. Mgrdechian told Mr. Bray that he would issue stock certificates for Mr. Bray's partial ownership of Purple Eagle, although Mr. Mgrdechian later failed to issue the certificates.

72.     Throughout the partnership, Mr. Mgrdechian was always 1-4 months late in paying Mr. Bray's salary and out of pocket expenses for travel, including flights and car rentals for the band, food, and lodging. To help offset Mr. Bray's accrued expenses for the band and unpaid salary, Mr. Mgrdechian proposed that Bray keep all cash received from merchandise sales while on the road and Mr. Mgrdechian would credit it against monies owed to Mr. Bray.  Mr. Bray kept track of all monies and communicated the amounts via emails to Mr. Mgrdechian.

73.     As Mr. Bray had limited financial education, he relied upon the advice of Mr. Mgrdechian, who explained that he was keeping track and would settle the balances by providing Mr. Bray with a 1099.   Mr. Bray never received the 1099 promised to him by Mr. Mgrdechian, or other tax documents. On information and belief, this is because Mr. Mgrdechian failed to file any tax returns or other tax documents for Purple Eagle throughout the duration of Bray's employment.

74.     After his termination, Mr. Bray's access to his company email was revoked. Through his attorney, Mr. Bray requested access to these company emails, so they could attempt to recreate his earnings for tax purposes, but Mr. Mgrdechian refused to grant Mr. Bray access to the emails.

**The Fall of Madison Rising**

75.     January and February of 2016 were busy months, as the band played 16 shows and were on the road for approximately 32 days of travel.  Despite the busy schedule, Mr. Mgrdechian was well behind in payroll obligations.

76.     In January 2016, Mr. Bray requested payment of his unpaid wages and time off from March 4-15, 2016 to visit an ailing relative overseas who was not expected to survive much longer.  Mr Mgrdechian was angry but agreed "as long as nothing major comes up."

77.     On February 29, 2016, three days before Mr. Bray was scheduled to leave the country, Mr. Mgrdechian unexpectedly issued a 30-day unpaid suspension for Mr. Bray, citing alleged behavioral issues.  On the same day Mr. Mgrdechian issued a letter of termination to Mrs. Bray.

78.     Attached to Mr. Bray's letter of suspension was a new one-sided contract and a 7-day "sign or be fired" grace period to comply.  Purple Eagle was significantly behind in its payroll obligations and Mr. Mgrdechian was desperate to coerce Mr. Bray into signing this new, unfavorable contract.  When Mr. Bray called Mr. Mgrdechian's bluff and refused to sign, Mr. Mgrdechian terminated the relationship.

79.     Unfortunately, rather than take responsibility and admit the truth behind the termination of Mr. Bray's employment, Mr. Mgrdechian fabricated and then published a false narrative.  He claimed that the reason for Mr. Bray's termination was a falsified listing of supposed misconduct, primarily alcohol related.

80.     At the time that the relationship ended, Purple Eagle was in arrears on salary owed to Mr. Bray.  While Purple Eagle did initially offer to pay these arears to Mr. Bray, they would only do so if Mr. Bray agreed to be bound by certain terms of an expired contract, including a non-compete clause that is void and unenforceable under New York law.  Moreover, Purple Eagle wanted Mr. Bray to agree to surrender all copyright ownership over the music that he had written.  Mr. Bray, understandably refused to agree to Purple Eagle's unreasonable terms in exchange for money that both sides agreed that he was legally entitled to.

81.     As the band's popularity was almost entirely based on Mr. Bray's performances and personality, his termination had an immediate negative impact on Purple Eagle, leading to the loss of bookings and an exodus of fans.

82.    In an effort to stanch the bleeding, Purple Eagle maliciously filed a completely frivolous lawsuit, as a platform to defame Counterclaimants and further a public relations smear campaign to damage Mr. Bray's musical career while attempting to salvage Madison Rising's crumbling fan base.

83.    In the complaint and associated filings, Mr. Mgrdechian made several outrageous, false and defamatory statements about Mr. Bray without any legitimate litigation purpose, other than to further his public relations smear campaign.  Immediately after filing, Purple Eagle issued a press release to ensure the widest dissemination of these false and defamatory statements.

**Madison Rising After Mr. Bray's Departure**

84.    Initially, Mr. Mgrdechian hired a new lead singer, who had competed against Mr. Bray in the 2011 auditions.  However, as this singer was not a veteran, he was quickly rejected by Madison Rising's fans, causing him to be immediately terminated.

85.    Mr. Mgrdechian then hired Clive "Rio" Hiett, a veteran of the Maryland Air National Guard.  Ironically, while Mr. Mgrdechian falsely claims to have fired Mr. Bray for alleged drunken antics, Mr. Hiett regularly posts live videos on Madison Rising's Facebook page of bizarre, bigoted, drunken rants.

86.    Without Mr. Bray's creative talents, the style, quality, and originality of Madison Rising's music has changed drastically.

87.    The first single Madison Rising released, after Mr. Bray's departure, titled "Dangerous," is a plagiarized version of "Diamond Eyes," by the band Shinedown. In both songs, the time signature, instrumental styling, vocal meter, musical arrangement and overall feel during the verses are practically identical. The single was released on September 8, 2016.  Incredibly, on

18

October 31, 2017, a video was posted on the DaBelly Magazine YouTube channel entitled "Madison Rising – Battered Not Broken Part 2,"[4] where Mr. Hiett admits the plagiarism:

> There were some people who messaged me yesterday, as a matter of fact, about "Dangerous" and one guy was like "oh, it sounds a lot like Shinedown." And I was like, "well, thank you."

88.    Free from Mr. Bray's messaging direction, Mr. Mgrdechian has shifted the band's rudder back over to hard right, retaking the label of "Hard Right Rockers" to promote Mr. Mgrdechian's divisive, hateful message.

89.    On August 13, 2017, the band released a single, "War." However, unlike the songs written by Mr. Bray about military themes, this song glorifies violence against left-leaning protesters, saying "this means war" and talking about "breaking jaws." In a transparent message, Mr. Mgrdechian geotagged the release announcement to Charlottesville, Virginia, which had erupted into violent protests for the two days prior to the single's release, with white supremacist James Alex Fields killing Heather Heyer. The music video posted to YouTube by Mr. Hiett[5] is much less subtle, showing scenes of violence between protesters and counter-protesters, with a caravan of large pickup trucks driven by the band rushing in at a high rate of speed to the chorus of the words "this means war."

90.    Mr. Mgrdechian is taking the brand which Mr. Bray worked so hard to build, and which Mr. Mgrdechian gave Mr. Bray part ownership of, and trashing it.

### AS AND FOR A FIRST CAUSE OF ACTION
### DECLARATORY RELIEF
### (against Defendants Purple Eagle and Mgrdechain)

91.    All prior paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

---

[4] https://www.youtube.com/watch?v=LyBJVo0yTJw&feature=youtu.be
[5] https://www.youtube.com/watch?v=1fk2wb1P6lM

92.    Plaintiff is a musical artist and a songwriter.  He is the sole author of the following musical compositions and a legal and/or beneficial owner of a copyright interest in and to those musical compositions.  Plaintiff, has previously registered each composition below with the U.S Copyright Office, holds a valid and registered copyright in the composition and sound recording, and is a co-author of the following musical compositions and a legal and/or beneficial owner of a copyright interest in and to those musical compositions:

    a.  Ready If It Goes There
    b.  Something Wicked
    c.  Hero
    d.  Amazing America
    e.  Soldier's Christmas
    f.  Warrior Inside
    g.  Last Call

93.    Plaintiff is the sole author of the lyrical compositions for following musical compositions and is a legal and/or beneficial owner of a copyright interest in and to those musical compositions. Plaintiff, has previously registered each composition below with the U.S Copyright Office, holds a valid and registered copyright in the composition and sound recording, and is a co-author of the following musical compositions and a legal and/or beneficial owner of a copyright interest in and to those musical compositions:

    a.  Soldiers of America
    b.  Open Road
    c.  Hallowed Ground II
    d.  Reflection PTSD
    e.  Lock N' Load
    f.  Come to the Ready

94.    Plaintiff, has previously registered each composition below with the U.S Copyright Office, holds a valid and registered copyright in the composition and sound recording, and is a co-author of the following musical compositions and a legal and/or beneficial owner of a copyright interest in and to those musical compositions:

    a.  Right to Bear
    b.  Hallowed Ground
    c.  Before the Hyphens Came

95.    Plaintiff solely created new arrangements of the following public domain musical compositions and a legal and/or beneficial owner of a copyright interest in and to those derivative musical compositions:

    a.  Star-Spangled Banner
    b.  America the Beautiful
    c.  God Bless America
    d.  The Marine's Hymn

96.    Defendants claims co-ownership or exclusive ownership in the sound recordings and musical compositions of the above listed songs, based on a flawed interpretation of an expired contract between the parties.  Defendants do not dispute the factual basis of Plaintiff's authorship, only the legal ownership based on the applicability of the contract.

97.    This cause of action is against both Defendant Purple Eagle, which wrongfully claims ownership of the copyrights to these songs, as well as Defendant Mgrdechian, who claims authorship to several of these songs.

98.    There is an actual and justiciable controversy between the parties. Defendants claim to be the sole owners of the songs and denies that Plaintiff has any legal interest or is entitled to any royalties for the sale or exploitation of the songs. Plaintiff claims that he is entitled to a proportionate interest and royalties in the songs based on his musical contributions to the recording and writing of such works. Plaintiff also claims that he has been the owner of each song since its inception and recording and is entitled to any royalties and/or monies earned for the exploitation of any of these songs from 2011 to the present.

99.    Defendants have filed a false adverse claim of ownership in the new arrangement of the Star-Spangled Banner.  As the U.S. Copyright Office does not determine the merits of disputed claims, this Court is the proper forum to litigate this dispute.

100.    A judicial declaration of the parties' respective ownership rights and obligations in relation to these songs is necessary and appropriate.

101.    Accordingly, Plaintiff seeks a judgment declaring the parties' respective rights and obligations.

**AS AND FOR A SECOND CAUSE OF ACTION**
**COPYRIGHT INFRINGEMENT**
**(against Defendant Purple Eagle)**

102.    All prior paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

103.    Defendant continuously, knowingly, and falsely holds itself out as the author of the compositions and sound recordings lawfully owned by the Plaintiff.

104.    Defendant unlawfully claims ownership of, and falsely misrepresents itself as the exclusive owner in the Plaintiff's copyright according to the Band Agreement Section 2.  However, Defendant's flawed position is based on a knowing and purposeful refusal to acknowledge the provisions of Section 6 of the Band Agreement, entitled *Credit,* which expressly carves out multiple exceptions to Section 2's waiver of copyright ownership:

        a.    Subsection 6 makes clear that the Agreement only applies to works which were specifically requested by the company.  This means that, as an independent contractor, Plaintiff was free to compose music on his own time, *sua sponte*, which fell completely outside of this agreement and which Purple Eagle would have no copyright interest in whatsoever.  In the event

22

that the band later used any such unrequested materials, either a separate written contract or the law and industry standards would apply.

b. Subsection 6 of the Agreement also addresses the ownership of materials that are requested and specifically disclaims any applicability of paragraph 2, to state that *"Notwithstanding anything to the contrary in this agreement, including, without limitation, the provisions in paragraph 2, in the event that Musician contributes materially to the authorship of any of the Material, Musician shall receive writer's credit and royalties in conjunction with all other co-authors of such material..."*

105.   Under Section 6, The Parties agreed that instances in which the material was not provided to Plaintiff, and instances in which Plaintiff contributed materially to the composition and sound recordings, would give rise to Plaintiffs copyright *authorship* and ownership in the recordings.

106.   In fact, the Parties expressly chose language that sets forth the situations in which Plaintiff would be considered an *author/owner*, on the sound recordings and compositions.

107.   Authors and owners of copyrights, under Title 17 of the U.S. Copyright Act enjoy, and are afforded what the industry commonly refers to as "the bundle of sticks".  These are the rights afforded to authors/owners of copyrights and they are exclusive and protected.

108.   Title 17, U.S. Code Section 106 *Exclusive Rights in Copyrighted Works,* sets out the main rights of a copyright owner/author.

a. "….. the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

i.  To reproduce the copyright work in copies or phonorecords;

23

ii.   To Prepare Derivative Works based upon the copyright work;

iii.  To Distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

iv.   In the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion picture and other audiovisual works, to perform the copyrighted works,

v.    in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

vi.   in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

vii.  in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

109.    Importantly, Section 6 *Credit*, of the Band Agreement further states what analysis is to be applied in determining the rights of the Plaintiff.  Section 6 continues….

a.    "…of such Material, for such Material per terms of this Agreement, other third party agreements and pursuant to the music industry standards."

110.    Music industry standards would dictate that, even in its most liberal application, the Band Agreement would not constitute a publishing agreement.  On a continued basis, both during, and after the Band Agreement term expired, Defendant holds himself/itself out as the Publisher on

24

the Plaintiff's sound recordings and compositions.  In fact, Defendant issued multiple licenses to third parties, including but not limited to synchronization licenses, blanket licenses, etc., and falsely represented himself/itself to be the Publisher.

111.    Music Industry standards, as well as basic contract law principles, would dictate that if this agreement was a "Songwriter/Publisher" Agreement, that it would be required to expressly mention the word publishing, and it would expressly mention the songwriting splits, the portion of the copyright that the songwriter was assigning to the publisher and the duties of the publisher.   The Band Agreement is not a publishing agreement and cannot be construed to be one under music industry standards.  The Band Agreement was simple:

      a.   Defendant hires Plaintiff to be a lead singer in a band;

      b.   Defendant pays Plaintiff to be a lead singer in a band;

      c.   If Defendant provides Plaintiff with Material to be recorded, then Plaintiff would waive his right to copyright authorship (Section 2 (a) of Band Agreement)

      d.   If Plaintiff writes his own material and contributes, at the request of Defendant, Plaintiff will be considered an author/owner according to music industry standards under Section 6 of the Band Agreement entitled *Credit*.

      e.   If Plaintiff writes his own material and contributes, *sua sponte,* without the request of the Defendant, the contract shall not apply and Plaintiff will retain all rights according to the law and industry standards, unless a separate agreement is executed.

112.    Defendant continues to represent himself as the Publisher on Plaintiff's composition, by not only filing adverse copyright registrations with the U.S. Copyright Office, but

also by expressly falsely representing Plaintiff transferred all copyright ownership "by transfer of agreement", to entities including, but not limited to; ASCAP, U.S. Copyright Office, third party licensing websites, etc.

113.    The Band Agreement evidences no transfer or waiver of Plaintiff's copyright ownership at any time in compositions and sound recordings that the Plaintiff authors, nor does it mention the word "Publishing".

114.    The United States Copyright Office has issued registration certificates evidencing Plaintiff's copyright interests to the following songs: "REGISTERED"

      a.  Soldier's Christmas (CR Registration #: PAu 3-380-536)

      b.  Warrior Inside (CR Registration #: PAu 3-841-032)

      c.  Last Call (CR Registration #: SR 793-468)

      d.  Amazing Grace/Taps ((CR Registration #: SR 793-468)

      e.  Ready If It Goes There
         i.  (CR Registration #: PA 2-139-606)

      f.  Amazing America
         i.  (CR Registration #:  PA 2-139-608)

      g.  Hallowed Ground II
         i.  (CR Registration #: PA 2-140-033)

      h.  Reflection PTSD
         i.  (CR Registration #:  PA 2-141-155)

      i.  Something Wicked
         i.  (CR Registration #: PA 2-139-596)

      j.  Open Road
         i.  (CR Registration #:  PA 2-140-038)

      k.  Lock N' Load
         i.  (CR Registration #: PA 2-140-975)

      l.  Hero

        i.  (CR Registration #: PA2-139-597)

m.  Come to the Ready
        i.  (CR Registration #: PA 2-140-983)

n.  America the Beautiful
        i.   (CR Registration #: PA 2-139-599)

o.  God Bless America
        i.   (CR Registration #: PA 2-139-604)

p.  The Marine's Hymn
        i.  (CR Registration #: 2-139-600)

q.  Star-Spangled Banner
        i.  (CR Registration #: PA 2-113-059)

115.    Through their conduct averred herein, Defendant Purple Eagle has infringed Plaintiffs' copyright in these compositions in violation of Sections 106 and 501 of the Copyright Act, 17 U.S.C. §§ 106 and 501, including, but not limited to, the following ways:

116.    Defendant, without Plaintiff's consent, and after the term of the Band Agreement had expired, knowingly and falsely held itself out as the lawful copyright owner in Plaintiff's composition entitled *The Marine's Hymn,*  by issuing a license for its use to Bob Parsons, the owner of the website,  who paid a fee of $5,000, for permission to reproduce, and publicly display, Plaintiff's copyright to promote the website: www.Godaddy.com.   This took place on three separate occasions in 2015, 2016 and 2017.   This use of Plaintiff's copyright was unauthorized, and therefore, infringed on Plaintiff's intellectual property rights afforded to authors under Title 17 of the US Copyright Act, specifically, the rights to publicly display the work, distribute copies of the work, reproduce the work, and perform the work.   The Defendant kept all revenue earned from this unauthorized licensing of the Plaintiff's lawful copyright.

117.    In 2017, well after the Band Agreement had expired, Defendant, without Plaintiff's consent, knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's

copyright entitled; *Star Spangled Banner*, and *Hero,* and issued a license for its use to IC Liberty Films, for their film entitled *In Search of Liberty.* These uses constituted unauthorized public displays, reproductions, and use of Plaintiff's copyrights. The Defendant falsely and knowingly misrepresented that it was both the Record Label and the Music Publisher of the Plaintiff's copyrights. This use of Plaintiff's copyrights was unauthorized, and therefore, infringed on Plaintiff's intellectual property rights guaranteed under Title 17 of the US Copyright Act, specifically, the rights to publicly display the works, distribute copies of the works, reproduce the works, and perform the works. The Defendant kept all revenue earned from this unauthorized licensing of the Plaintiff's lawful copyright. Interestingly, the Defendant authorized the use of Plaintiff's voice for the actor in the film to lip synch to, without Plaintiff's consent.

118. On June 26, 2017, well after the Band Agreement had expired, Defendant, without Plaintiff's consent, knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's copyright entitled; *Star Spangled Banner* and issued a license for its use to NBC Universal for its broadcast of the LPGA - SOLHEIM CUP (on the Golf Channel). This broadcast constituted an unauthorized public display and use of Plaintiff's copyright. The Defendant falsely and knowingly misrepresented that it was both the Record Label and the Music Publisher of the Plaintiff's copyright. This use of Plaintiff's copyright was unauthorized, and therefore, infringed on Plaintiff's intellectual property rights guaranteed under Title 17 of the US Copyright Act, specifically, the rights to publicly display the work, distribute copies of the work, reproduce the work, and perform the work. The Defendant kept all revenue earned from this unauthorized licensing of the Plaintiff's lawful copyright.

119. On October 10, 2014, Defendant, without Plaintiff's consent, knowingly and falsely held itself out as the lawful copyright owner of the Plaintiff's copyright in the *Star-Spangled*

*Banner* when it issued a license for its use to The Golf Channel's, show *Feherty – Live, Episode "Live! (Show 2)"*, which aired on January 22, 2014. This broadcast constituted an unauthorized public display and use of Plaintiff's copyright. This unauthorized use of the copyright therefore infringed on the Plaintiff's rights afforded to authors under Title 17 of the U.S. Copyright Act, specifically, the right to publicly display the work, distribute copies of the work, reproduce the work and perform the work. The Defendant kept all revenue earned from this unauthorized licensing of the Plaintiff's lawful copyright.

120.    Defendant, without Plaintiff's consent, knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's copyright in the *Star Spangled Banner*, by issuing a license for its use, to Steve West, for his film *A Nation Divided* on www.amazon.com. The use of Plaintiff's copyright constituted an unauthorized public display and unlawful reproduction and use of Plaintiff's copyright. This use of Plaintiff's copyright was unauthorized, and therefore, infringed on Plaintiff's intellectual property rights guaranteed under Title 17 of the US Copyright Act, specifically, the rights to publicly display the work, distribute copies of the work, reproduce the work, and perform the work. The Defendant kept all revenue earned from this unauthorized licensing of the Plaintiff's lawful copyright.

121.    Defendant, without Plaintiff's consent, knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's copyright in the *Star-Spangled Banner,* licensed its use for The Outdoor Channel, for a show entitled *Steve's Outdoor Adventures*. This broadcast constituted an unauthorized public display, reproduction and use of Plaintiff's copyright. This use of Plaintiff's copyright was unauthorized, and therefore, infringed on Plaintiff's intellectual property rights guaranteed under Title 17 of the US Copyright Act, specifically, the rights to publicly display the work, distribute copies of the work, reproduce the work, and perform the work. The

Defendant kept all revenue earned from this unauthorized licensing of the Plaintiff's lawful copyright.

122.    Defendant, without Plaintiff's consent, knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's copyright in the *Star-Spangled Banner,* licensed its use for the Texas Rangers broadcast of their Fourth of July celebrations.  This broadcast constituted an unauthorized public display, reproduction, and use of Plaintiff's copyright.  This use of Plaintiff's copyright was unauthorized, and therefore, infringed on Plaintiff's intellectual property rights guaranteed under Title 17 of the US Copyright Act, specifically, the rights to publicly display the work, distribute copies of the work, reproduce the work, and perform the work.   The Defendant kept all revenue earned from this unauthorized licensing of the Plaintiff's lawful copyright.

123.    Defendant, without Plaintiff's consent, knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's copyright in the *Star-Spangled Banner,* and licensed its use to Lionsgate Films, for use in Dinesh D'Souza's film entitled *America, Imagine the World Without Her* in 2014.  This reproduction constituted an unauthorized public display and use of Plaintiff's copyright.  This use of Plaintiff's copyright was unauthorized, and therefore, infringed on Plaintiff's intellectual property rights guaranteed under Title 17 of the US Copyright Act, specifically, the rights to publicly display the work, distribute copies of the work, reproduce the work, and perform the work.   The Defendant kept all revenue earned from this unauthorized licensing of the Plaintiff's lawful copyright.

124.    Defendant, without Plaintiff's consent, knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's copyright in the *Star-Spangled Banner,* licensed its use for the company EasyRider Motorcycles, for its use in their commercial, to promote their product.  This use of Plaintiff's copyright was unauthorized, and therefore, infringed on Plaintiff's

intellectual property rights as an author guaranteed under Title 17 of the US Copyright Act, specifically, the rights to publicly display the work, distribute copies of the work, reproduce the work, and perform the work.    The Defendant kept all revenue earned from this unauthorized licensing of the Plaintiff's lawful copyright.

125.    Defendant, without Plaintiff's consent, knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's copyright in the *Star-Spangled Banner,* licensed its use to Peter Stonefield.  This use of Plaintiff's copyright was unauthorized, and therefore, infringed on Plaintiff's intellectual property rights guaranteed under Title 17 of the US Copyright Act, specifically, the rights to publicly display the work, distribute copies of the work, reproduce the work, and perform the work.    The Defendant kept all revenue earned from this unauthorized licensing of the Plaintiff's lawful copyright.

126.    Defendant, without Plaintiff's consent, knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's copyright in the *Star Spangled Banner*, licensed its use to Warfighter Tobacco Company, LLC, for its use in the promotion of their company.  This use constituted an unauthorized public display, reproduction and use of Plaintiff's copyright.   This use of Plaintiff's copyright was unauthorized, and therefore, infringed on Plaintiff's intellectual property rights guaranteed under Title 17 of the US Copyright Act, specifically, the rights to publicly display the work, distribute copies of the work, reproduce the work, and perform the work. The Defendant kept all revenue earned from this unauthorized licensing of the Plaintiff's lawful copyright.

127.    Defendant, without Plaintiff's consent, knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's copyright in *Amazing America,* licensed its use to The Outdoor Channel, The Sportsman Channel. This broadcast constituted an unauthorized public

display, reproduction, and use of Plaintiff's copyright. This use of Plaintiff's copyright was unauthorized, and therefore, infringed on Plaintiff's intellectual property rights guaranteed under Title 17 of the US Copyright Act, specifically, the rights to publicly display the work, distribute copies of the work, reproduce the work, and perform the work. The Defendant kept all revenue earned from this unauthorized licensing of the Plaintiff's lawful copyright.

128. Defendant, without Plaintiff's consent, knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's copyright in *Lock n' Load,* licensed its use to the SEALFIT Network and Unbeatable Mind Podcast. This broadcast constituted an unauthorized public display, reproduction, and use of Plaintiff's copyright. This use of Plaintiff's copyright was unauthorized, and therefore, infringed on Plaintiff's intellectual property rights guaranteed under Title 17 of the US Copyright Act, specifically, the rights to publicly display the work, distribute copies of the work, reproduce the work, and perform the work. The Defendant kept all revenue earned from this unauthorized licensing of the Plaintiff's lawful copyright.

129. For all the above songs listed as Registered, Defendant, without Plaintiff's consent, knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's copyrights to Touch Tunes, an internet site that makes music available for purchasing through sales and streams. Defendant, unlawfully authorized the Touch Tunes platform to distribute, reproduce and publicly display the Plaintiff's copyright. The Defendant kept all revenue earned from this unauthorized use of the Plaintiff's copyright.

130. For all the above songs listed as Registered, Defendant, without Plaintiff's consent, knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's copyrights to CD Baby, an internet site that make music available for purchasing through sales and streams' platforms. Defendant uploaded Plaintiff's copyrights, without consent, to the platform,

misrepresented that it was the lawful copyright owner and therefore authorized CD Baby the right to sell, distribute, reproduce and publicly display the Plaintiff's copyrights.  The Defendant kept all revenue from that was generated from this unauthorized use of the Plaintiff's copyright.

131.    For all the above songs listed as Registered, Defendant, without Plaintiff's consent, knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's copyrights to iTunes, an internet site that make music available for purchasing through sales and streams. Defendant uploaded Plaintiff's copyrights, without consent, to the platform, misrepresented that it was the lawful copyright owner and therefore authorized iTunes the right to sell, distribute, reproduce and publicly display the Plaintiff's copyrights.  The Defendant kept all revenue from that was generated from this unauthorized use of the Plaintiff's copyright.

132.    For all the above songs listed as Registered, Defendant, without Plaintiff's consent, knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's copyrights to Amazon Music, an internet site that make music available for purchasing through sales and streams.    Defendant uploaded Plaintiff's copyrights, without consent, to the platform, misrepresented that it was the lawful copyright owner and therefore authorized Amazon,  the right to sell, distribute, reproduce and publicly display the Plaintiff's copyrights.  The Defendant kept all revenue from that was generated from this unauthorized use of the Plaintiff's copyright.

133.    For all the above songs listed as Registered, Defendant, without Plaintiff's consent, knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's copyrights to Spotify, an internet site that make music available for purchasing through sales and streams. Defendant uploaded Plaintiff's copyrights, without consent, to the platform, misrepresented that it was the lawful copyright owner and therefore authorized Spotify the right to sell, distribute,

33

reproduce and publicly display the Plaintiff's copyrights.  The Defendant kept all revenue from

that was generated from this unauthorized use of the Plaintiff's copyright.

134.    For all the above songs listed as Registered, Defendant, without Plaintiff's consent,

knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's copyrights to

Google Play, an internet site that make music available for purchasing through sales and streaming.

Defendant uploaded Plaintiff's copyrights, without consent, to the platform, misrepresented that it

was the lawful copyright owner and therefore authorized Google Play,  the right to sell, distribute,

reproduce and publicly display the Plaintiff's copyrights.  The Defendant kept all revenue from

that was generated from this unauthorized use of the Plaintiff's copyright.

135.    For all the above songs listed as Registered,  Defendant, without Plaintiff's consent,

knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's copyrights an

issued an unauthorized use to www.youtube.com .  Defendant, without authorization from

Plaintiff, authorized www.youtube.com to publicly display, distribute and reproduce the Plaintiff's

copyright.  Defendant also monetized its YouTube account, thereby generating revenue from the

unauthorized use of the Plaintiff's copyright.  (***Monetization is when the YouTube account

holder authorizes advertisements to play before, during, or after the streaming of the Plaintiff's

copyright.    Those advertisers pay to have their products played during each stream.  This

generates revenue.  Defendant collected all revenue from the monetization of the youtube account

and did not pay Plaintiff anything.

136.    For all the above songs listed Registered, Defendant, without Plaintiff's consent,

knowingly and falsely held itself out as the rightful copyright owner in Plaintiff's copyrights and

issued an unauthorized use to a company called Mechanical CD Production. By granting this

permitted use, the Defendant falsely held itself out as the copyright holder, knowingly, without

Plaintiff's consent, and such action resulted in the reproduction and distribution of Plaintiff's copyrights on compact discs, vinyl and other sources of media.  Defendant, as of this date, has not paid anything to Plaintiff for this use.  The unlawful issuance of this license infringed on Plaintiff's right to reproduce and distribute his copyrights under Title 17.

137.    Defendant's acts of infringement are willful, intentional and purposeful, in disregard of and with indifference to Plaintiffs' rights.

138.    As a direct and proximate result of said infringement by Defendant, Plaintiff is entitled to damages in an amount to be proven at trial.

139.    Plaintiff is also entitled to Defendant's profits attributable to the infringement, pursuant to 17 U.S.C. § 504(b), including an accounting of and a constructive trust with respect to such profits.

140.    Plaintiff is further entitled to his attorneys' fees and full costs pursuant to 17 U.S.C. § 505 and otherwise according to law.

141.    As a direct and proximate result of the foregoing acts and conduct, Plaintiff has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. Plaintiff is informed and believe and on that basis aver that unless enjoined and restrained by this Court, Defendant will continue to infringe Plaintiff's rights in the Infringed Composition. Plaintiff is entitled to preliminary and permanent injunctive relief to restrain and enjoin Defendant's continuing infringing conduct.

**AS AND FOR A THIRD CAUSE OF ACTION**
**ACCOUNTING**
**(against Defendant Purple Eagle)**

142.    All prior paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

143.    Defendants have received funds from the sale of albums, advertising, and licensing of various musical compositions and arrangements, which were created and therefore owned by Plaintiff, but have failed to account for these funds to Plaintiff.

144.    Upon information and belief, the profits derived from Defendants' use of Plaintiff's original compositions and arrangements have been used for personal expenditures or unauthorized business expenditures other than the intended and legal purpose of submitting payment to Plaintiff. Moreover, upon information and belief, monies due to Plaintiff have been transferred to accounts in the name of one or more of the Defendants or persons or entities other than the Defendants.

145.    As author and owner of these compositions and arrangements, Plaintiff has a right to an accounting of the income derived from those compositions and arrangements through an inspection of Defendants' assets and accounts, and Defendants have a duty to account. Plaintiff currently has little or no knowledge of the sales figures or the financial standing or condition of the Defendants.

146.    Under the circumstances herein, no adequate legal remedy exists to provide an inspection of Defendants' books and records and Plaintiff invokes the Court's equitable jurisdiction in seeking this accounting.

### AS AND FOR A FOURTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (against Defendant Purple Eagle)

147.    All prior paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

148.    Plaintiff conferred a benefit upon Defendants by allowing them to make use of his musical compositions and arrangements.

149.    Defendants promise of payment and ownership in exchange for the benefit of these musical compositions and arrangements was clear and unambiguous in its terms.

150.    Defendants knew and understood that Plaintiff was expecting to be fully paid by Defendants and that Plaintiff reasonably and foreseeably relied upon Defendants' promise of payment.

151.    Defendants have been making use of, and continue to make use of, Plaintiff's musical compositions, recordings and likeness for a profit, while failing to make any payment to Plaintiff.

152.    It would be unjust and inequitable to allow Defendants to retain the benefit of the musical compositions and arrangements without fully paying Plaintiff the fair market value, including royalties and interest, in an amount to be determined by a jury, but in no event less than $75,000.

## AS AND FOR A FIFTH CAUSE OF ACTION
## CONSTRUCTIVE TRUST
### (against Defendants Purple Eagle and Mgrdechian)

153.    All prior paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

154.    When Plaintiff's contract expired on May 31, 2014, Mr. Mgrdechian declined to pay him the required contract extension fee.  Instead. Mr. Mgrdechian promised that if Plaintiff continued working for Purple Eagle, without a contract, he would continue to be paid his base salary, plus royalties, and would become a partner in Purple Eagle and Madison Rising.

155.    Plaintiff justifiably relied upon this promise by Mr. Mgrdechian and continued to perform for the band and write original musical compositions and arrangements for the band to

use, with the expectation that he would be paid royalties and was a part owner of Purple Eagle and Madison Rising.

156.    In addition to his creative and branding contributions, Plaintiff also filled a vital public relations/damage control role, as he constantly had to protect the band's image and relations from being tarnished by Mr. Mgrdechian's behavior.

157.    Plaintiff's actions are what directly led to Purple Eagle and Madison Rising becoming a popular, successful venture.

158.    Mr. Mgrdechian would be unjustly enriched if permitted to retain sole ownership of the company, the band, and all of the intellectual property, goodwill and customers, which was built almost entirely on the work performed by Plaintiff, which was performed in detrimental reliance upon Mr. Mgrdechian's promise.

159.    Permitting Mr. Mgrdechian to retain sole ownership is unfair and unjust and in light of the totality of the circumstances warrants imposing a constructive trust under equitable principles of New York law.

160.    The value of the constructive trust that Plaintiff seeks well exceeds $75,000.

161.    Plaintiff prays for an order impressing a constructive trust upon all holders of the company, intellectual property, goodwill and customers of Purple Eagle and Madison Rising and ordering that stock, along with any income, commissions or other benefits be disgorged and paid to Plaintiff.

**WHEREFORE**, Plaintiff demands that a judgment be entered against Defendants for damages, attorneys' fees, pre-judgment interest, a constructive trust, an accounting, and all other relief deemed just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury as to all issues.

Dated  March 14, 2019
       New York, New York

Respectfully submitted,

Timothy C. Parlatore, Esq.
One World Trade Center, Suite 8500
New York, New York 10007
212-679-6312
212-202-4787 Facsimile
Timothy.parlatore@parlatorelawgroup.com